**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____
                                        :
MARY B. ENGSTROM and WILLIAM R.    :        No. 11-CV-01232 SAS
ENGSTROM, Individually and on Behalf    :
of All Others Similarly Situated,       :        **ECF CASE**
                                        :
              Plaintiffs,               :
                                        :
       vs.                              :        CLASS ACTION
                                        :
ELAN CORPORATION, PLC; G. KELLY    :        COMPLAINT FOR VIOLATION OF THE
MARTIN and SHANE COOKE,            :        FEDERAL SECURITIES LAWS
                                        :
              Defendants.               :        DEMAND FOR JURY TRIAL
_____
                                        :

## INTRODUCTION AND OVERVIEW

1.     This is a class action for violations of the anti-fraud provisions of the federal

securities laws on behalf of all purchasers of Elan Corporation, plc ("Elan" or the "Company")

publicly traded stock or American Depository Shares ("ADSs") between July 2, 2009 and August

5, 2009 (the "Class Period"), who were damaged thereby.

2.     Elan is a neuroscience-based biotechnology company.  During the Class Period,

Defendants made materially false and misleading statements about a transaction between Elan

and Johnson & Johnson ("JNJ").  Defendants stated that JNJ had agreed to pay $1 billion for

18.4% ownership of Elan and 50.1% ownership of a new company, Janssen Alzheimer

Immunotherapy ("Janssen"), a subsidiary formed by JNJ to acquire Elan's Alzheimer's

immunotherapy program.

3.     However, Defendants failed to disclose that the agreement with JNJ violated the

terms of an existing collaboration agreement between Elan and Biogen Idec Inc. ("Biogen") for

the development and sale of multiple sclerosis drug Tysabri.  That agreement provided that if

either Elan or Biogen were to experience a change of control, the other company could negotiate

to purchase the full rights to Tysabri.  Per the agreement, this right could not be assigned to any

other party.  The Elan/JNJ agreement, however, gave JNJ the option to finance an Elan change of

control purchase of Biogen's stake in Tysabri.  The Elan/JNJ agreement also gave Elan's

negotiating power in such a transaction to JNJ, thus designating an obligation it had to JNJ in

violation of the Elan/Biogen agreement.  When this came to light, Elan was forced to renegotiate

its agreement with JNJ, with JNJ paying $115 million less to Elan than it had previously agreed

to.

4.     When the possible breach of the Elan/Biogen agreement finally came to light, the

price of Elan's ADSs declined as artificial inflation came out of the price.

## JURISDICTION AND VENUE

5.     The claims asserted herein arise under §§10(b) and 20(a) of the Securities

Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R.

§240.10b-5, promulgated thereunder.  Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C.

§78aa.

6.     Venue is proper here pursuant to §27 of the 1934 Act.  Elan conducts business in

this District, its ADSs trade on the New York Stock Exchange ("NYSE"), which is located in

this District, and acts giving rise to the violations complained of herein occurred in this District.

## THE PARTIES

7.     Plaintiffs, Mary B. Engstrom  and William R. Engstrom, purchased Elan

securities during the Class Period as set forth in the attached certifications and were damaged

thereby.

8.      Defendant, Elan, maintains operations at 875 Third Avenue, 3rd Floor, New York, New York.  Elan's ADSs are traded on the NYSE and its stock trades on the Dublin Stock Exchange, which are efficient markets.

9.      Defendant, G. Kelly Martin ("Martin"), was Elan's President and Chief Executive Officer ("CEO") at all relevant times.

10.     Defendant, Shane Cooke ("Cooke"), was Elan's Chief Financial Officer ("CFO") at all relevant times.

11.     The defendants identified in ¶¶ 9 and 10 are referred to herein as Individual Defendants.

## BACKGROUND

12.     On August 15, 2000, Elan entered into a collaboration agreement with Biogen regarding the drug Tysabri.  The Elan/Biogen agreement provides as follows with respect to assignment:

> 17.1 ASSIGNMENT. Neither this Agreement nor any right or obligation hereunder may be assigned or delegated, in whole or part, by either Party without the prior express written consent of the other, except as expressly set forth below in this Section 17.1.

## CLASS PERIOD EVENTS AND STATEMENTS

13.     On July 2, 2009, Elan and JNJ issued a press release which stated in relevant part:

> Johnson & Johnson (NYSE: JNJ) and Elan Corporation, plc (NYSE: ELN) today announced a definitive agreement whereby Johnson & Johnson will acquire substantially all of the assets and rights of Elan related to its Alzheimer's Immunotherapy Program (AIP Program), through a newly formed company.  In addition, Johnson & Johnson, through its affiliate, will invest $1 billion in Elan in exchange for newly issued American Depositary Receipts (ADSs) of Elan which will represent 18.4% of Elan's outstanding ordinary shares.

The AIP Program represents Elan's interest in a collaboration with Wyeth to research, develop and commercialize selective products for the treatment and/or prevention of neurodegenerative conditions, including Alzheimer's disease.

Johnson & Johnson, through its affiliate, will assume and continue Elan's activities with Wyeth under the AIP Program and will initially commit up to $500 million to continue the development and launch activities of bapineuzumab, a potential first-in-class treatment that is being evaluated for slowing the progression of Alzheimer's disease, as well as other compounds.  The agreement provides for additional funding obligations of the parties if needed.

In consideration for the transfer of these rights and assets, Elan will receive a 49.9% equity interest in the newly formed Johnson & Johnson company that will acquire the AIP Program.  Elan will be entitled to a 49.9% share of the profits and certain royalty payments upon the commercialization of products under the collaboration with Wyeth.

The AIP Program includes multiple compounds being evaluated for slowing the progression of Alzheimer's disease.  The lead compound (bapineuzumab), administered intravenously once every three months, is currently in Phase 3 clinical trials.  A subcutaneous formulation, administered once a week, is currently in Phase 2 trials.  In addition, a vaccine for Alzheimer's disease (ACC-001) is also under development.

* * *

Elan Chief Executive Officer, Kelly Martin, believes that this transaction positively impacts Elan and patients globally.  "This transaction will leverage Elan's unique scientific and clinical work and leadership in bringing treatments to market that potentially slow the progression of Alzheimer's disease.  The Elan commitment to scientific innovation and patients remains absolute and we will continue to build upon and expand our leadership in the fields of neuroscience and immunology."

Husseini Manji, M.D., Global Therapeutic Head, Neuroscience, Johnson & Johnson Pharmaceutical Research & Development, added: "This transaction will be a key component in achieving our vision to develop treatments that target underlying disease biology, thereby helping to prevent some of society's most devastating illnesses.  We expect to focus our resources on bringing the AIP Program to fruition as quickly as possible because of its potential to slow the progression of Alzheimer's disease."

* * *

Upon closing, the transaction will have an estimated dilutive impact of $0.02 to $0.03 on Johnson & Johnson 2009 adjusted earnings per share.  The companies anticipate concluding the transaction in the second half of 2009.

The boards of directors of both Johnson & Johnson and Elan have each approved the transaction, which represents the culmination of an in-depth strategic review by Elan.  The transaction is conditioned on clearance under the Hart-Scott-Rodino Antitrust Improvements Act and other customary closing conditions.

Elan will host an analyst call at 8:00 a.m. EDT today.  This call will be simultaneously webcast over the Internet and will be available to investors, members of the news media and the general public.  The event can be accessed by visiting Elan's website at www.elan.com and clicking on the Investor Relations section, then on the event icon.

14.    As a result of these statements, the price of Elan's ADSs increased from $7.00 to $7.60 in one day, an increase of over 8% as the price became artificially inflated.

15.    On July 20, 2009, the *Wall Street Journal* blog *WSJ Deal Journal* posted the following:

Could Johnson & Johnson's Elan deal be a prescription for a J&J takeover of Biogen Idec, Jeanne Whalen and Dana Cimilluca ask on the WSJ's Deal Journal.

JNJ agreed earlier this month to buy 18.4% of Elan, the Irish biotech company, to get access to Elan's experimental drugs for Alzheimer's disease.   But Shane Cooke, Elan's chief financial officer, tells Deal Journal that J&J and Elan also have "arrangements in place" relating to Tysabri, the multiple sclerosis drug Elan markets with Biogen.

Here's the Tysabri deal Elan and Biogen have: if either company is approached by a potential acquirer, the other party in the Tysabri partnership has the right to buy the targeted company's share of Tysabri.  So, if a large pharma company wanted to buy control of Biogen, Elan would have the right to buy Biogen's piece of Tysabri.

Cooke told Deal Journal that Elan and J&J have "certainly had discussions" about Tysabri.  "There are arrangements in place that would, could see us working together if there was a change in control to occur" at Biogen, he said in a telephone interview.  "We might end up working together to acquire the other half

of Tysabri if the circumstances were right," he said.

Cooke declined to comment further.  Elan and J&J didn't appear to disclose anything about Tysabri when they announced that J&J was buying a stake in Elan.

If J&J does have a lever of control over Tysabri — one of Biogen's most valuable products — it might make another company think twice about trying to buy Biogen.  J&J has much deeper pockets than Elan does alone, making it more able to fund a buyout of Tysabri.

All of this could signal that J&J itself has an interest in buying Biogen.  There are no indications that talks are currently underway, but Biogen did put itself on the block in late 2007.  A J&J spokesman declined to comment on any interest JNJ may have in Biogen.  He also declined to comment on Cooke's remarks.

16.     On July 12, 2009, *Bloomberg* news published an article that stated in relevant

part:

Johnson & Johnson might become Elan Corp.'s partner on the multiple sclerosis drug Tysabri, replacing Biogen Idec Inc., in the event Biogen is acquired, Elan executives said today.

Elan markets its best-selling Tysabri, a treatment for multiple sclerosis, with Biogen.  The two companies have an agreement that if one of them is acquired, the other partner has the option to buy its rights to Tysabri.  J&J said July 2 that it would buy an 18 percent stake in Dublin-based Elan and invest in developing its experimental treatments for Alzheimer's disease.

Johnson & Johnson has an option to help finance Elan's purchase of Biogen's rights to Tysabri in the event that Biogen is acquired, Elan Chief Executive Officer Kelly Martin said.  In such an arrangement, Johnson & Johnson effectively would end up as Elan's 50-50 partner, he said.

"In the event of a change of control, we can buy the other half of the asset with a financing arrangement with our new largest shareholder," Martin said today in a telephone interview.  "Nothing would change around the asset or financials or the structure.  We are in the same position we were in, but with a different partner, one which we have chosen.  That partner, if they so choose, is called Johnson & Johnson."

Biogen in December 2007 abandoned a plan to sell itself.  Investor Carl Icahn pressured the Cambridge, Massachusetts-based company last year to resume the

-6-

effort to find a buyer.  Elan's Martin said he isn't anticipating a takeover of
Biogen.

'Contingent Things'

"These are very contingent things," Martin said.

Elan gave J&J, based in New Brunswick, New Jersey, the option to help the Irish
company with financing because Elan can't afford to buy back the rights to
Tysabri on its own, Martin said.

"We wanted to make sure we were not flat-footed from a financing point of
view," Martin said.  "Why on Earth would we ever want to sell our half of the
asset?"

Martin said talk that J&J's deal with Elan is a possible means to acquire Biogen is
"completely speculative."

"This deal is about Elan and J&J," he said.

17.    Defendants' statements set forth above were materially false and misleading

because Defendants failed to disclose the full, material terms of the agreement between Elan and

JNJ.  Specifically, Defendants failed to disclose that Elan had designated to JNJ an obligation it

had to Biogen, thus breaching the Elan/Biogen agreement.

## THE TRUTH BEGINS TO EMERGE

18.    On August 6, 2009, Elan issued a press release that stated in relevant part:

DUBLIN--(BUSINESS WIRE)--Aug. 6, 2009-- Elan Corporation, plc
(NYSE:ELN) today announced that it has filed suit against Biogen Idec Inc. in
Federal Court in New York seeking declaratory and injunctive relief that certain
aspects of Elan's recently announced transaction with affiliates of Johnson &
Johnson (the "Transaction") comply with Elan's Collaboration Agreement with
Biogen Idec for the development and marketing of Tysabri (the "Collaboration
Agreement").

In a letter to Elan dated July 28, 2009, Biogen Idec alleged that Elan was
in material breach of the Collaboration Agreement.  Biogen Idec's assertion
against Elan relates to Elan's ability to obtain financing from an affiliate of

-7-

Johnson & Johnson to potentially purchase Biogen Idec's Tysabri rights, if Biogen Idec undergoes a change of control. Biogen Idec made this assertion even though it was not in possession of the relevant agreement related to the Transaction at the time, which Elan has offered to share with Biogen Idec. Elan strongly believes that it is in compliance in all respects with the Collaboration Agreement.

Elan is committed to aggressively and proactively protecting its science, property and assets.

Elan noted in a statement, "There's nothing in the pending Transaction that is contrary to our collaboration agreement with Biogen Idec for Tysabri, an important therapeutic discovered and primarily developed by Elan. Elan's collaboration with Biogen Idec has been in place since 2000. During that time, Elan and Biogen Idec have obtained regulatory approval for Tysabri in the United States, the European Union and other countries and have made the significant benefits of Tysabri available to a growing number of patients throughout these countries. Nothing about that relationship has changed. This is the same agreement we have been operating under for the last nine years. It is unfortunate that, because of Biogen Idec's actions, Elan was left with no alternative but to seek court intervention to protect its interest."

In seeking declaratory relief, Elan has requested that the Court conduct expedited proceedings given the sixty (60) day cure period following which Biogen may seek to terminate the Elan-Biogen Collaboration Agreement. Elan continues its previously stated commitment to closing the transaction with Johnson & Johnson as soon as possible.

Elan also requested that the Court enter judgment against Biogen Idec permanently enjoining Biogen Idec from terminating the Collaboration Agreement based on their July 28, 2009 Letter.

19.   In the complaint Elan filed that same day, the Company asserted that the language in its agreements with both JNJ and Biogen was "plain and unambiguous."

20.   As a result of these disclosures, the price of Elan's ADSs declined from $8.01 to $7.64 in one day, a 4.6% decline, as artificial inflation came out of the price.

## POST-CLASS PERIOD EVENTS

21.   On September 4, 2009, District Court Judge Deborah Batts of the United States

District Court for the Southern District of New York held that the agreement between Elan and

JNJ violated Elan's collaboration agreement with Biogen.

22.     On September 14, 2009, Elan issued a press release that stated in relevant part:

DUBLIN, Sep 14, 2009 (BUSINESS WIRE) -- Elan Corporation, plc
(NYSE: ELN) today announced that it has cured an unintended breach of its
Tysabri Collaboration Agreement with Biogen that had been identified by the
United States District Court for the Southern District of New York.  Elan's
previously announced transaction with Johnson & Johnson has been amended to
eliminate in its entirety the Strategic Financing and Collaboration Agreement that
was the subject of the Court's September 3, 2009, hearing and Biogen's
previously disclosed notice of breach.  Concurrently with this announcement, Elan
has also informed Biogen that Elan has cured the unintended breach within the
time period permitted under Elan's Collaboration Agreement with Biogen.

Elan has agreed to modify the terms of its pending transaction with
Johnson & Johnson, which was previously announced on July 2, 2009, to provide
for the completion of all aspects of the transaction announced with the exception
that the Strategic Financing and Collaboration Agreement related to Tysabri, and
the subject matter of that agreement, have been eliminated and are not now
included in the revised transaction.

Under the revised definitive agreement, Johnson & Johnson, through its
affiliate, will invest $885 million in Elan in exchange for newly issued American
Depositary Receipts (ADSs) of Elan, which will represent 18.4% of Elan's
outstanding ordinary shares immediately following the closing.  In addition, as
previously announced on July 2, 2009, Johnson & Johnson will acquire
substantially all of the business, assets and rights of Elan related to its
Alzheimer's Immunotherapy Program, through a newly formed company, Janssen
Alzheimer Immunotherapy, and will initially commit up to $500 million to
continue the development and launch activities of bapineuzumab, a potential first-
in-class treatment that is being evaluated for slowing the progression of
Alzheimer's disease, as well as other compounds.  In consideration for the transfer
of these rights and assets, Elan will receive a 49.9% equity interest in Janssen
Alzheimer Immunotherapy.  Elan will be entitled to a 49.9% share of the profits
and certain royalty payments upon the commercialization of products under the
collaboration with Wyeth.

23.     The transaction between Elan and JNJ closed on September 17, 2009.

24.     On March 12, 2010, Reuters published an article that stated in relevant part:

BOSTON (Reuters) - Irish drugmaker Elan Corp Plc (ELN.I) has quietly given Johnson & Johnson (JNJ.N) the right to acquire its 49.9 percent stake in their joint Alzheimer's disease venture -- a move that could deter potential bidders for Elan.

The agreement, buried in Elan's recently filed annual report, is part of a broader transaction announced last July in which J&J agreed to pay $1 billion for 18.4 percent of Elan and take a 50.1 percent stake in a new company working on Elan's most advanced experimental Alzheimer's drugs.

The terms of that deal were revised downwards after it emerged Elan and J&J had come to a secret -- and improper -- agreement under which J&J could gain a half share in the blockbuster multiple sclerosis drug, Tysabri, which Elan markets in a 50-50 partnership with U.S. biotech company Biogen Idec Inc. (BIIB.O).

Now, it emerges Elan not only gave J&J an option on Tysabri, it also gave the company an option to acquire its 49.9 percent stake in Janssen Alzheimer Immunotherapy, the subsidiary formed by J&J to acquire Elan's Alzheimer's Immunotherapy Program (AIP).  The unit includes bapineuzumab, Elan's most advanced experimental Alzheimer's drug.

"Many large shareholders are up in arms about this," said Larry Feinberg, who runs Oracle Investment Management and holds 5 million Elan shares.  "Elan has one of the best neuroscience businesses in the world, but now Biogen has right of first refusal on Tysabri and J&J has right of first refusal on bapineuzumab.  It's something that will get in the way of a potential acquirer."

Discussion of a possible buyer for Elan is far from academic.  The company is one of research firm Morningstar's top 10 likely acquisition targets.

Biogen, whose standstill agreement with Elan expires in June, has long been considered the most logical suitor for Elan as the relationship between them -- each has the right to acquire the other's share of Tysabri should there be a change of control at either company -- represents a hurdle to potential third-party acquirer.

But Elan concedes its agreement with J&J on bapineuzumab could have a similarly chilling effect.

"We are party to agreements that may discourage a takeover attempt that might be viewed as beneficial to our shareholders," the company said in its annual report, listing as examples its Tysabri agreement and the newly revealed Alzheimer's drug agreement with J&J.

Elan did not directly respond to an email asking why it did not disclose the matter

when the transaction was announced.  Bob Purcell, a company spokesman, said only that "change of control clauses are a standard part of any asset transaction within the pharmaceutical industry."

A potential Elan acquirer would get either a non-controlling financial interest in Janssen AI or the cash equivalent to its fair value, he said.

***Karen Andersen, an analyst at Morningstar, said the agreement should have been reported at the time.***

***"I think this is material information," she said. "I think this should have been volunteered and discussed when they had their conference calls to discuss the deal, rather than putting us in a position of digging for it later."***

Bapineuzumab is being developed in conjunction with Pfizer Inc (PFE.N), which took the drug over when it acquired Wyeth.  Pfizer currently has a 50 percent stake in the partnership, while J&J and Elan have roughly 25 percent each.  If J&J exercises its option -- which would kick in if Elan were to be acquired -- it would gain Elan's share.

Some investors have written off bapineuzumab because it showed mixed results in a mid-stage clinical trial.  But Alzheimer's disease, a degenerative condition that robs victims of memory, afflicts 26 million people worldwide and, if bapineuzumab turns out to be successful, it could generate billions of dollars in revenue.

The company's delay in disclosing the Alzheimer's option is particularly galling to investors, given its side agreement with J&J on Tysabri last year landed Elan in court.

In that case, a U.S. federal court judge ruled Elan breached its contract with Biogen, prompting Elan to withdraw the Tysabri option from its deal with J&J. J&J, in response, cut the amount it would pay for its Elan stake by $115 million to $885 million.

Elan's shares have fallen 13 percent to $7.45 from a 12-month high of $8.58 at the time the original transaction was announced on July 2.

## <u>SCIENTER</u>

25.     During the Class Period, Defendants had both the motive and opportunity to conduct fraud.  They also had actual knowledge of the misleading nature of the statements they

made or acted in reckless disregard of the true information known to them at the time.  In so

doing, Defendants participated in a scheme to defraud and committed acts, practices and

participated in a course of business that operated as a fraud or deceit on purchasers of Elan stock

and ADSs during the Class Period.

## LOSS CAUSATION

26.     During the Class Period, as detailed herein, Defendants made false and misleading

statements and engaged in a scheme to deceive the market and a course of conduct that

artificially inflated the price of Elan's securities price and operated as a fraud or deceit on Class

Period purchasers of Elan securities by misrepresenting the Company's business.  Later, when

Defendants' prior misrepresentations and fraudulent conduct became apparent to the market,

Elan's stock and ADS prices fell precipitously, as the prior artificial inflation came out of the

prices over time.  As a result of their purchases of Elan stock and/or ADSs during the Class

Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under

the federal securities laws.

## NO SAFE HARBOR

27.     Elan's verbal "Safe Harbor" warnings accompanying its oral forward-looking

statements ("FLS") issued during the Class Period were ineffective to shield those statements

from liability.

28.     Defendants are also liable for any false FLS pleaded because, at the time each FLS

was made, the speaker knew the FLS was false and the FLS was authorized and/or approved by

an executive officer of Elan who knew that the FLS was false.  None of the historic or present

tense statements made by Defendants were assumptions underlying or relating to any plan,

projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: <u>FRAUD ON THE MARKET</u>

29.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock and ADSs traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock and ADSs; and

(e)    Plaintiffs and other members of the Class purchased Elan stock and/or ADSs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

30.    At all relevant times, the markets for Elan stock and ADSs were efficient for the following reasons, among others:

(a)    As a regulated issuer, Elan filed periodic public reports with the Securities and Exchange Commission;

(b)      Elan regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(c)      Elan ADSs were actively traded in an efficient market, namely the NYSE, under the symbol ELN.  Its stock traded on the Dublin Stock Exchange, which is also an efficient market.

## CLASS ACTION ALLEGATIONS

31.      Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Elan stock or ADSs during the Class Period (the "Class").  Excluded from the Class are Defendants, directors and officers of Elan and their families and affiliates.

32.      The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Elan had more than 400 million ADSs and shares of stock outstanding, owned by thousands of persons.

33.      There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)      Whether the 1934 Act was violated by Defendants;

(b)      Whether Defendants omitted and/or misrepresented material facts;

-14-

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the prices of Elan stock and ADSs were artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

34.     Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct alleged herein.

35.     Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

36.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of § 10(b) of the 1934 Act and
### Rule 10b-5 Against All Defendants

37.     Plaintiffs incorporate ¶¶ 1 through 36 by reference.

38.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading.

39.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)   Employed devices, schemes, and artifices to defraud;

(b)   Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Elan stock and ADSs during the Class Period.

40.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Elan stock and ADSs.  Plaintiffs and the Class would not have purchased Elan stock and/or ADSs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

41.   As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Elan stock and ADSs during the Class Period.

## COUNT II

### For Violation of § 20(a) of the 1934 Act Against All Defendants

42.   Plaintiffs incorporate ¶¶ 1 through 41 by reference.

43.   The Individual Defendants acted as controlling persons of Elan within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public

statements about Elan, the Individual Defendants had the power and ability to control the actions

of Elan and its employees.  Elan controlled the Individual Defendants and its other officers and

employees.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of

the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.      Awarding Plaintiffs and the members of the Class damages and interest;

C.      Awarding Plaintiffs' reasonable costs, including attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: February 22, 2011                Respectfully submitted,


                                         s/ Patrick A. Klingman_____
                                        Patrick A. Klingman (PK-3658)
                                        James E. Miller
                                        SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
                                        65 Main Street
                                        Chester, Connecticut  06412
                                        Telephone: (860) 526-1100
                                        Facsimile: (860) 526-1120
                                        E-mail: pklingman@sfmslaw.com
                                                jmiller@sfmslaw.com

                                        Plaintiffs' Counsel