UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

MARY B. ENGSTROM and WILLIAM
R. ENGSTROM, Individually and on
Behalf of All Others Similarly Situated,

                Plaintiffs,

    - against -

ELAN CORPORATION, PLC, G.
KELLY MARTIN and SHANE COOKE,

        Defendants.

**OPINION AND ORDER**

**11 Civ. 1232 (SAS)**



------------------------------------------------- X

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

Lead Plaintiff, Thomas Bown, II, brings this putative securities fraud

class action individually and on behalf of all purchasers of American Depository

Shares ("ADSs") of Elan Corporation, plc, ("Elan") between July 2, 2009, and

August 5, 2009 (the "Class Period").  Bown  asserts claims under Sections 10(b)

and 20(a) of the Securities Exchange Act of 1934,[1] and Rule 10b-5 promulgated

---

[1]    *See* 15 U.S.C. §§ 78j(b), 78t(a).

thereunder by the Securities and Exchange Commission,[2]  for alleged false and misleading statements made by Elan, its Chief Executive Officer ("CEO"), G. Kelly Martin, and its former Chief Financial Officer ("CFO"), Shane Cooke (collectively the "defendants").

Defendants now move to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim as required under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA")[3] on the grounds that (1) Bown has failed to plead facts giving rise to a strong inference of scienter, and (2) Bown has failed to plead particular statements that were false and misleading.  Because I find that Bown has failed to plead facts raising a strong inference of scienter, defendants' motion is granted and Bown is granted leave to amend.

## II.   BACKGROUND[4]

### A.   The Parties and Their History

---

[2]   *See* 17 C.F.R. § 240.10b-5.

[3]    *See* 15 U.S.C. § 78u-4 *et seq.*

[4]   The facts in this case are taken from Bown's Amended Complaint ("Compl.") and are presumed true for purposes of this motion.  In addition, the Court has taken judicial notice of documents incorporated into the Amended Complaint by reference and publically available documents filed with this Court in a previous related matter, *Elan Pharma Int'l Ltd. v. Biogen, Inc. n/k/a Biogen Idec Inc.*, No. 09 Civ. 6928 (S.D.N.Y.) ("*Elan I*").

2

Elan is a neuroscience-based biotechnology company headquartered in Ireland with its primary research and development, manufacturing and marketing facilities located in Ireland and the United States.[5] Elan's ADSs are listed on the New York Stock Exchange ("NYSE") under the symbol ELN, and its shares of common stock trade on the Irish Stock Exchange.[6] Elan is organized into two business units, BioNeurology and Elan Drug Technologies.[7] Elan Drug Technologies describes itself as "the world's leading drug delivery business" which "develops and manufactures innovative pharmaceuticals" in partnership with other pharmaceutical companies.[8] Elan derives nearly all of its revenue from Tysabri, a Food and Drug Administration ("FDA") approved therapy for relapsing forms of multiple sclerosis.[9] Tysabri is a tremendously successful blockbuster drug — one with sales exceeding one billion dollars.[10] During the Class Period, G.

---

[5]     See Compl. ¶ 2.

[6]     See id.

[7]     See id. ¶ 3.

[8]     Id.

[9]     See id.

[10]     See Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Pl. Mem.") at 5.

Kelly Martin was Elan's President and CEO, and Shane Cooke was Elan's CFO.[11]

Lead plaintiff Bown purchased Elan ADSs on the NYSE during the Class Period in reliance on defendants' public statements.[12]  Bown's ADSs, as well as those of all individuals who purchased ADSs during the Class Period, declined in value after Elan lost an opportunity to secure an additional $115 million as part of a major agreement because of defendants' alleged false and misleading statements.[13]

### B.    The Biogen Agreement

On August 15, 2000, Elan entered into a collaboration agreement (the "Biogen Agreement") with Biogen, a large pharmaceutical company, to develop and finance the drug that ultimately became Tysabri.[14]  The Biogen Agreement contains a non-assignment clause providing that: "Neither this Agreement nor any right or obligation hereunder may be assigned or delegated, in whole or part, by either party without the prior express written consent of the other, except as expressly set forth below . . . ."[15]  The Biogen Agreement also has a "change of

---

[11]    *See* Compl. ¶¶ 15-16.

[12]    *See id.* ¶ 10.

[13]    *See id.*

[14]    *See id.* ¶ 18.

[15]    *Id.*

4

control" provision under which if either party undergoes a change in control, the nonacquired party obtains the right to buy out the acquired party's interest in Tysabri.[16]  The Biogen Agreement also has a confidentiality provision, a common practice in the pharmaceutical industry, because it contains sensitive information.[17] Furthermore, the Biogen Agreement provides that in the case of a material breach by either party, the breaching party may lose all of its rights in Tysabri if it fails to cure within sixty days.[18]

Tysabri was approved by the FDA in 2004, and by 2009, several companies were interested in gaining access to both Tysabri, and Elan's other potential blockbuster drug Bapineuzumab, a treatment for Alzheimer's Disease in phase III of FDA testing.[19]  Tysabri is sold and marketed by Elan and Biogen pursuant to the Biogen Agreement, and the agreement is absolutely essential to

---

[16]    *See id.* ¶¶ 6, 29; *see also* 8/11/09 Affidavit of Nigel Bernard John Clerkin, senior vice president of Elan, filed in connection with *Elan I* ("Clerkin Aff.") ¶ 27 (filed under seal), Ex. 2 to 7/14/11 Affidavit of Mary McCann, defendant's counsel ("McCann Aff.").

[17]    *See* 8/6/09 Complaint filed in connection with *Elan I* ("*Elan I* Compl.") ¶ 3.

[18]    *See* Compl. ¶ 6; *see also* Clerkin Aff. ¶ 53.

[19]    *See* Compl. ¶ 19.

5

Elan's financial viability.[20]  Since 2000, the Elan-Biogen partnership has been "by

and large a very good" one.[21]

### C.    The J&J Agreement

By 2009, Elan had incurred a substantial amount of debt and needed

to sell itself, or a part of itself, in order to service its debt.[22]  On July 2, 2009, Elan

issued a joint press release with Johnson & Johnson ("J&J") announcing a

"definitive agreement" (the "J&J Agreement") whereby J&J would acquire

substantially all of Elan's assets and rights related to its Alzheimer's

Immunotherapy Program ("AIP"), and J&J would invest one billion dollars in Elan

in return for 18.4 percent of Elan's outstanding ADSs.[23]  The J&J Agreement

contemplated that the rights and interests in AIP — including Bapineuzumab —

would be transferred to a newly formed company, Janssen Alzheimer

Immunotherapy ("Janssen"), in which J&J would own a 50.1 percent equity

interest and the remaining 49.9 percent would be owned by Elan.[24]  The J&J

---

[20]     *See* 8/26/09 Deposition of G. Kelly Martin, CEO of Elan, filed in connection with *Elan I* ("Martin Tr.") at 240:7-241:19, Ex. 3 to McCann Aff.

[21]     *Id.* at 241:5-6.

[22]     *See* Compl. ¶ 21.

[23]     *See id.* ¶ 22.

[24]     *See id.*

Agreement also had a provision giving J&J an option to finance Elan's purchase of Biogen's rights in Tysabri in the event that Biogen experienced a change of control ("the Option").[25]  The Option further required Elan to follow instructions from J&J regarding certain aspects of the negotiation that would take place if Elan were to have the opportunity to purchase Biogen's stake in Tysabri.[26]  Elan informed its shareholders that the Option was added to ensure that Elan would have sufficient resources to buy out Biogen's interest in Tysabri if and when Biogen were to undergo a change in control.[27]  Elan stated that the actual "change of control" provisions were confidential, but its existence was a matter of public knowledge.[28]  Bown asserts that the Option was added in an effort to "coerce Biogen into acceding to the J&J Agreement despite the fact that the J&J Agreement violated the express terms of the Biogen Agreement."[29]

As a result of the press release, the price of Elan's ADSs increased by

---

[25]     *See id.* ¶ 27; *see also* 7/21/09 Elan Second Quarter 2009 Earnings Conference Call Transcript ("Earnings Call") at 5, Ex. 8 to McCann Aff.

[26]     *See* Compl. ¶ 29.

[27]     *See* Earnings Call at 5.

[28]     *See id.*; *see also* Compl. ¶ 20.

[29]     Compl. ¶ 8.

over eight percent in a single day.[30]  Analysts immediately noted that this deal would be an effective way for Elan to supplement its liquidity and reduce leverage.[31]  In articles in the *Wall Street Journal* and *Bloomberg News* dated July 20, and July 21, 2009, market commentators further reflected on the consequences of the J&J Agreement.[32]  Both articles, however, also emphasized the Option and speculated about whether the Option signified an interest by either Elan or J&J to ultimately acquire Biogen's rights in Tysabri or even, perhaps, to acquire Biogen itself.[33]  Defendants' statements in both the articles as well as Elan's Earnings Call identified the Option as an important part of the J&J Agreement.[34]

In negotiating the J&J Agreement, Defendants carefully considered any potential consequences that the J&J Agreement might have on the Biogen Agreement.[35]  In fact, Elan stood to lose nearly all of its revenue if it breached the Biogen Agreement, and in negotiating the J&J Agreement defendants represented

---

[30]     *See id.* ¶ 23.

[31]     *See id.* ¶ 24.

[32]     *See id.* ¶¶ 25-27.

[33]     *See id.* ("All this could signal that J&J itself has an interest in buying Biogen.").

[34]     *See* Earnings Call at 5.

[35]     *See* Compl. ¶ 28.

to J&J that the agreement would not create any conflict with the Biogen Agreement.[36]  Bown contends, however, that defendants never disclosed the provision of the Option granting J&J the ability to direct Elan in certain aspects of potential buy out negotiations, the so-called "secret provision."[37]

### D.    The Declaratory Judgment Action

On July 28, 2009, during the Class Period, Biogen sent Elan a letter advising Elan that it had breached material terms of the Biogen Agreement by entering into the J&J Agreement.[38]  Specifically, Biogen complained that Elan had violated the "non-assignment" clause in the Biogen Agreement, and that failure to cure within sixty days would result in Elan's loss of rights in Tysabri.[39]  On August 6, 2009, Elan issued a press release countering Biogen's letter as well as announcing that Elan had filed suit in this Court seeking declaratory judgment and injunctive relief.[40]  Elan commenced its declaratory judgment action on August 6, 2009, and in its Complaint, Elan asked this Court to find that Elan's participation

---

[36]     *See* Martin Tr. at 246:4-247:21.

[37]     Compl. ¶¶ 29-31.

[38]     *See id.* ¶ 32.

[39]     *See id.*

[40]     *See id.* ¶ 33. Bown claims that withholding the letter from Biogen until August 6 was an additional instance of false and misleading conduct.  *See* Pl. Mem. at 7.

in the J&J Agreement did not constitute a breach of the Biogen Agreement.[41]  Elan also asked this Court for a preliminary injunction and submitted affidavits as well as copies of both the Biogen and the J&J Agreements under seal for the Court's review.[42]  Elan further asked the Court for an expedited briefing schedule because of its concern that if it was found to be in breach, Elan would have less than sixty days remaining to cure.[43]  Following these disclosures, the price of Elan's ADSs declined 4.6 percent in a single day.[44]

      The action was assigned to Judge Deborah Batts of this Court, who granted Elan's request for expedited briefing, and ruled on the matter at a hearing on September 3, 2009.[45]  Judge Batts denied Elan's motion for a preliminary injunction, after finding that the J&J Agreement, as submitted, would constitute a breach of the Biogen Agreement.[46]  Specifically, the Court found that "while it would seem to the Court that while a right has not been assigned . . . it appears to

---

[41]     *See* Compl. ¶ 34; *see also Elan I* Compl. ¶ 9.

[42]     *See* Compl. ¶ 34.

[43]     *See Elan I* Compl. ¶¶ 17-22.

[44]     *See* Compl. ¶ 35.

[45]     *See id.* ¶ 36.

[46]     *See id.*; *see also* 9/3/09 Hearing Transcript ("Hearing Tr.") at 167:1-168:25, Ex. 4 to McCann Aff.

the Court that Elan has delegated an obligation that it has to J&J by taking direction from J&J about the negotiations for the purchase price" of a potential buyout of Biogen's rights in Tysabri.[47]   Elan was given twenty-three days to cure its breach, and it proceeded to do so immediately.[48]   Bown contends that the declaratory judgment action was a "sham litigation" designed to force Biogen "into acceding to Elan's demands based upon the 'carrot' that Elan now had brought a potential suitor to the table for Biogen in the form of J&J."[49]   Bown further asserts that the breach of the Biogen Agreement was either "plainly and unambiguously" known to defendants or, if not, they were extremely reckless in failing to discover it.[50]

### E.   Restructuring the J&J Agreement

On September 3, 2009, Elan issued a press release stating "We respect the Court's decision . . . .   We are committed to working with Johnson & Johnson to close the transaction as quickly as possible, consistent with the Biogen-Elan

---

[47]   *See* Hearing Tr. at 168:5-11.

[48]   *See id.* at 168:21-22; 9/17/09 Affidavit of G. Kelly Martin filed in connection with *Elan I* ("Martin Aff.") ¶¶ 10-11, Ex. 7 to McCann Aff.

[49]   Compl. ¶ 34.

[50]   *See id.*; *see also* Pl. Mem. at 12-13.

Tysabri Collaboration Agreement."[51]   A second press release was issued by Elan

eleven days later on September 14, 2009, stating that Elan had "cured an

unintended breach" of the Biogen Agreement by modifying the terms of its

"pending transaction with Johnson & Johnson."[52]   The J&J Agreement finally

closed on September 17, 2009.[53]   However, because of the elimination of the

Option, J&J dropped its investment in Elan to $885 million instead of one billion

dollars.[54]   At that point, the declaratory action was dismissed as moot inasmuch as

the J&J Agreement no longer constituted a breach of the Biogen Agreement.[55]   The

J&J Agreement included its own "change of control" provision whereby J&J could

purchase Elan's 49.9 percent share of Janssen if Elan where to undergo a change of

control.[56]   As reported by *Reuters*, ADSs in Elan were down thirteen percent by

March 12, 2010 since the J&J Agreement was first announced on July 2, 2009.[57]

     Bown initiated the present action on February 23, 2011, claiming that

---

[51]   9/3/09 Elan Press Release, Ex. 5 to McCann Aff.

[52]   Compl. ¶ 37.

[53]   *See id.* ¶ 38.

[54]   *See id.*

[55]   *See* 9/22/09 Order of Dismissal in *Elan I*, Ex. 6 to McCann Aff.

[56]   *See* Compl. ¶ 29.

[57]   *See id.* ¶ 39.

in addition to breaching its agreement with Biogen, Elan and its chief officers are guilty of securities fraud for failing to fully inform the public about the Option and its "secret provision," and failing to disclose how Elan thereby breached the Biogen Agreement, created a high risk of breaching the Biogen Agreement, or recklessly failed to investigate whether Elan breached the Biogen Agreement.[58] Following defendants' original motion to dismiss filed on June 6, 2011, Bown requested and was granted leave to amend his Complaint pursuant to Rule 15(a)(1)(B) and defendants' motion to dismiss was withdrawn.  Defendants now move again to dismiss Bown's Amended Complaint.[59]

## III.   LEGAL STANDARD

### A.   Motion to Dismiss

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court evaluates the sufficiency of the complaint under the "two-pronged approach" suggested by the Supreme Court in *Ashcroft v. Iqbal*.[60]

---

[58]      *See id.* ¶¶ 53-56.

[59]      According to Bown, the Complaint was amended to clarify (1) that the proposed class included only purchasers of Elan's ADSs, and (2) that Bown's allegations concerned Elan's failure to disclose that the J&J Agreement breached, or had a high risk of breaching, the Biogen Agreement, rather than Bown's failure to disclose the J&J Agreement at all.  *See* Pl. Mem. at 7 n.9.

[60]      556 U.S. —, 129 S. Ct. 1937, 1950 (2009).

*First*, a court "'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"[61] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to withstand a motion to dismiss.[62] *Second*, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[63] To survive a Rule 12(b)(6) motion to dismiss, the allegations in the complaint must meet a standard of "plausibility."[64] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[65] Plausibility "is not akin to a probability requirement;" rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[66]

---

[61] *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 129 S. Ct. at 1950). *Accord Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010).

[62] *Iqbal*, 129 S. Ct. at 1949 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[63] *Id.* at 1950. *Accord Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010).

[64] *Twombly*, 550 U.S. at 564.

[65] *Iqbal*, 129 S. Ct. at 1949 (quotation marks omitted).

[66] *Id.* (quotation marks omitted).

14

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."[67]   However, the court may also consider a document that is not incorporated by reference, "where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."[68]   A court may also take judicial notice of "the status of other lawsuits in other courts and the substance of papers filed in those actions."[69]

### 1.   Pleading Requirements

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"[70]   To survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet

---

[67]   *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

[68]   *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).  *Accord Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006).

[69]   *Schenk v. Citibank/Citigroup/Citicorp*, No. 10 Civ. 5056, 2010 WL 5094360, at *2 (S.D.N.Y. Dec. 9, 2010) (citing *Anderson v. Rochester-Genesee Reg'l Transp. Auth.*, 337 F.3d 201, 205 n.4 (2d Cir. 2003)).

[70]   *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

the standard of "plausibility."[71]  A claim is facially plausible "when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged."[72]  Plausibility "is not akin to a

probability requirement;" rather, plausibility requires "more than a sheer

possibility that a defendant has acted unlawfully."[73]  Pleading a fact that is "merely

consistent with a defendant's liability" does not satisfy the plausibility standard.[74]

### 2.    Securities Fraud

"Securities fraud claims are subject to heightened pleading

requirements that the plaintiff must meet to survive a motion to dismiss."[75]  These

heightened pleading requirements are imposed by Federal Rule of Civil Procedure

9(b) and the PSLRA.[76]

### a.    Rule 9(b)

A complaint alleging securities fraud must satisfy Rule 9(b)'s

---

[71]    *See Iqbal*, 129 S. Ct. at 1949; *Twombly*, 550 U.S. at 564.

[72]    *Iqbal*, 129 S. Ct. at 1949 (quotation marks omitted).

[73]    *Id.* (quotation marks omitted).

[74]    *Id.* (quotation marks omitted).

[75]    *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

[76]    *See* 15 U.S.C. § 78u-4(b).

16

requirement that "the circumstances constituting fraud . . . be stated with particularity."[77]   "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits."[78]   To comply with the requirements of Rule 9(b), a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[79]   "Allegations that are conclusory or unsupported by factual assertions are insufficient."[80]

### b.    The PSLRA

The PSLRA requires plaintiffs to state with particularity "both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud."[81]   The PSLRA specifies

---

[77]    Fed. R. Civ. P. 9(b).  *Accord ATSI*, 493 F.3d at 99.

[78]    *ATSI*, 493 F.3d at 99 (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)).

[79]    *Rombach*, 355 F.3d at 170 (quotation marks omitted).  *Accord ATSI*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

[80]    *ATSI*, 493 F.3d at 99.

[81]    *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quotation marks omitted) (citing 15 U.S.C. § 78u-4(b)(1), (2)).  *Accord ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d

that the plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[82]  When evaluating allegations of scienter, the court must look at the complaint as a whole and "take into account plausible opposing inferences."[83]

"[A]n inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."[84]  The inference need not, however, be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences."[85]  The inquiry on a motion to dismiss is as follows:  "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"[86]  "If the

---

187, 196 (2d Cir. 2009).

[82]     *Tellabs*, 551 U.S. at 314 (quoting 15 U.S.C. § 78u-4(b)(2)).

[83]     *Id.* at 323.  These plausible opposing inferences may be based only on the complaint and other public documents on which courts ordinarily rely in deciding a motion to dismiss, "while constantly assuming the plaintiff's allegations to be true."  *Id.* at 322, 326-27.

[84]     *Id.* at 314.

[85]     *Id.* at 324 (citation omitted).

[86]     *Id.* at 326.  *Accord In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) ("The critical inquiry is whether a reasonable person would deem the inference of scienter [to be] at least as strong as any opposing inference.").

plaintiff alleges a false statement or omission, the PSLRA also requires that 'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'"[87]

## B.    Amendments to Pleadings

"[A] party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."[88]  "[W]hether to permit a plaintiff to amend its pleadings is a matter committed to the Court's sound discretion."[89]  However, the Supreme Court has explained that

> [i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.  In the absence of any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. — the leave sought should, as the rules

---

[87]    *ATSI*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(1)).

[88]    Fed. R. Civ. P. 15(a)(2).

[89]    *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (quotation marks omitted).

require, be "freely given."[90]

Accordingly, "'[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead.'"[91]

## IV.   APPLICABLE LAW

### A.    Section 10(b) and Rule 10b-5

To state a claim under Rule 10b-5 for misrepresentations, a "plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."[92]

#### 1.    Misstatements or Omissions of Material Fact

In order to satisfactorily allege misstatements or omissions of material fact, a complaint must "state with particularity the specific facts in support of

---

[90]    *Foman v. Davis*, 371 U.S. 178, 182 (1962).  *Accord Jin v. Metropolitan Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002).

[91]    *Tyler v. Liz Claiborne, Inc.*, No. 09 Civ. 04147, 2011 WL 4498983, at *17 (S.D.N.Y. Sept. 29, 2011) (quoting *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 298 (S.D.N.Y. 2006)).

[92]    *ATSI*, 493 F.3d at 105 (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)).

[plaintiffs'] belief that [defendants'] statements were false when made."[93]  In situations "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."[94] Mere "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."[95]

## 2.    Scienter

A plaintiff may plead scienter by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."[96]

---

[93]    *Rombach*, 355 F.3d at 172 (quotation marks omitted).

[94]    *Novak*, 216 F.3d at 309 (citation omitted).

[95]    *Id.* (citation omitted).  *Accord Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) ("The fact that management's optimism about a prosperous future turned out to be unwarranted is not circumstantial evidence of conscious fraudulent behavior or recklessness:  People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.") (quotation marks omitted).

[96]    *ATSI*, 493 F.3d at 99 (citing *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000)).  *Accord In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 398 (S.D.N.Y. 2007) (holding that plaintiffs adequately pleaded scienter because the allegations supported the inference that the company and the officers were at least reckless in not knowing that the financial statements were false and in failing to disclose internal control weaknesses); *In re eSpeed*, 457 F.

"Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."[97]  "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."[98]

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."[99] Under this theory of scienter, a plaintiff must show that the defendant's conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been

--------

Supp. 2d at 292 (holding that plaintiffs must "specifically allege defendants' knowledge of facts or access to information contradicting their public statements").

[97]    *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (quotation marks omitted).

[98]    *Id.  Accord ECA*, 553 F.3d at 198.

[99]    *Kalnit*, 264 F.3d at 142.  *Accord South Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009); *In re Novagold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 297 (S.D.N.Y. 2009) (quoting *ECA*, 553 F.3d at 198-99).

22

aware of it."[100]  "To state a claim based on recklessness, plaintiffs may either specifically allege defendants' knowledge of facts or access to information contradicting defendants' public statements, or allege that defendants failed to check information they had a duty to monitor."[101]

However, pleadings based on "fraud by hindsight" are not actionable as a matter of law.[102]  [A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."[103]  "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them."[104]

### B.    Section 20(a)

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the

---

[100]    *South Cherry St.*, 573 F.3d at 109 (quotation marks and emphasis omitted).  *Accord ECA*, 553 F.3d at 203.

[101]     *In re Gildan Activewear, Inc.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009) (quotation marks and citation omitted).

[102]    *See Slayton v. American Express Co.*, 604 F.3d 758, 776 (2d Cir. 2010); *see also Caiafa v. Sea Containers, Ltd.*, 525 F. Supp. 2d 398, 410-11 (S.D.N.Y. 2007).

[103]    *Novak*, 216 F.3d at 309.

[104]    *Id.*

primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."[105] "Allegations of control are not averments of fraud and therefore need not be pleaded with particularity."[106] "'At the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard.'"[107]

## V.   DISCUSSION

Defendants argue that Bown has failed to plead two necessary elements under the PSLRA:  (1) scienter and (2) false and misleading statements. Because I find that Bown has failed to plead scienter adequately, I do not consider the issue of false and misleading statements.

Bown argues that in failing to disclose the "secret provision," defendants had either a motive to defraud or, in the alternative, that defendants acted in an extremely reckless manner.  Because Bown has failed to plead facts giving rise to a "strong inference" that defendants intended to commit fraud, his

---

[105]   *ATSI*, 493 F.3d at 108 (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).

[106]   *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006).

[107]   *In re Scottish Re*, 524 F. Supp. 2d at 385.   *Accord In re Converium Holding AG Sec. Litig.*, No. 04 Civ. 7897, 2006 WL 3804619, at *14 (S.D.N.Y. Dec. 28, 2006) (quoting *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 415-16 (S.D.N.Y. 2003)).

Complaint cannot survive a motion to dismiss.

### A.    Elan Had No Motive to Commit Fraud

Bown and Elan present this Court with two plausible sets of inferences that can be drawn from Elan's course of action regarding the J&J Agreement and the creation of the Option.  To support his theory that defendants had a motive to act fraudulently, Bown alleges that the Option was part of a purposeful scheme by Elan and J&J to undermine Biogen by intentionally breaching the Biogen Agreement and hiding that breach.[108]  In essence, Bown submits that defendants knowingly breached the Biogen Agreement by entering into the J&J Agreement as a way to "pressure Biogen" into allowing itself and its rights in Tysabri to be acquired by J&J and Elan.[109]  According to Bown, because defendants knew that Biogen was also in serious need of a purchaser or financing source, Elan entered into the J&J Agreement to scare away any potential purchaser of Biogen.[110]  In other words, because Elan, with the help of J&J, could now afford to purchase Biogen's interest in Tysabri in the event of a change in control at Biogen, Biogen would be unable to find additional sources of financing or a

---

[108]    *See* Compl. ¶ 8.

[109]    *See id.* ¶ 21.

[110]    *See id.* ¶ 28.

willing buyer.  Thus, Biogen's only choice would be to remain silent in the face of the J&J Agreement, and ultimately accept the fact that in order to raise capital it would have to sell itself, or its rights in Tysabri, to Elan or J&J.  Bown contends that the fact that the Option was kept confidential was "highly suspicious" and further supports the inference that defendants knew that they were breaching the Biogen Agreement, and failed to disclose this information anyway.[111]

The alternative inference that can be drawn from defendants' conduct, according to defendants, is that defendants were interested in securing immediate financing as well as locking in a commitment for future financing for Biogen's rights in Tysabri, should those ever become available.  Obtaining a commitment for financing did not need to occur in a way that would breach the Biogen Agreement — though the particular arrangement in the J&J Agreement did.  In fact, Elan had substantial financial interests in both the Biogen and the J&J Agreements and a breach of the Biogen Agreement would have been financially ruinous to Elan.[112]  If Elan were to breach the Biogen Agreement, it would lose its only significant source of revenue — its rights to Tysabri.  Inasmuch as J&J was planning on making a substantial investment in Elan, it would be important to both

---

[111]    *See id.* ¶ 29.

[112]    *See* Martin Tr. at 247:13-21.

Elan and J&J that the J&J Agreement not breach the Biogen Agreement because otherwise Elan would be worthless.  Moreover, if the J&J Agreement were a breach of the Biogen Agreement, no opportunity to purchase Biogen's rights in Tysabri could ever come to fruition.  Thus, defendants maintain that the only plausible inference here is that Elan would never hide details of the Option that involved breaching the Biogen Agreement, because it would never knowingly breach the Biogen Agreement.

Furthermore, although the details of the Option were kept confidential, there is no question that the general nature of the Option as well as the "change of control" provision in the Biogen Agreement were disclosed by defendants.[113]  Furthermore, no party contests the fact that confidentiality agreements are common in the pharmaceutical industry.  Thus, defendants claim that this is not at all suspicious.  Additionally, as soon as Judge Batts found that Elan was in breach of the Biogen Agreement, Elan immediately renegotiated the J&J Agreement.  Although J&J was understandably willing to pay less for the agreement without the Option, J&J was still interested in the overall framework of the agreement, suggesting that Elan and J&J's motivations were not malicious.  Defendants argue that Elan and J&J's business incentives strongly suggest that

---

[113]    *See* Compl. ¶¶ 20, 25, 27.

they did not intend to breach the Biogen Agreement, and in furtherance of that scheme, fail to disclose information to that effect.  Defendants thus ask this court to infer no nefarious motives from Elan and J&J's conduct.

In weighing these competing explanations, Bown's version of what happened is substantially less cogent and compelling than the alternative.  Notably, this case is not about whether Elan breached the Biogen Agreement — Judge Batts held that it did.  Rather the question that I must address at this stage is whether Bown has adequately pleaded that Elan's failure to disclose certain details about the Option at the time of the breach was a false or misleading omission made with the "intent to deceive, manipulate, or defraud."[114]  Bown's claims boil down to defendants secretly breaching a contract in order to acquire or help J&J acquire Biogen.  While "the artificial inflation of stock prices in order to acquire another company may, 'in some circumstances,' be sufficient for scienter,"[115] in this case, Bown claims that it was an intentional breach of contract, rather than inflated stock price, that was perpetrated in order to facilitate a lucrative acquisition.  Elan and J&J do not deny, however, that they would potentially be interested in acquiring Biogen's valuable rights to Tysabri.  Indeed, "the desire to achieve the most

---

[114]     *Tellabs*, 551 U.S. at 319.

[115]     *ECA*, 553 F.3d at 201 n.6 (quoting *Rothman*, 220 F.3d at 92–94).

28

lucrative acquisition proposal can be attributed to virtually every company."[116]  In

planning for the contingency of acquiring Biogen, though, every indicia of intent is

consistent with defendants' good-faith belief that the J&J Agreement did not

breach the Biogen Agreement: (1) Elan represented this explicitly in writing to

J&J;[117] (2) Elan represented this fact to its shareholders by conference call;[118] (3)

Elan stood to lose nearly all of its revenue from a breach; (4) Elan brought an

action for declaratory judgment insisting it was not in breach; and (5) Elan cured

the J&J Agreement immediately after this Court found Elan to have been in

breach.[119]

      Furthermore, there is no connection between Elan or J&J's desire to

acquire Biogen's rights and a breach of the Biogen Agreement.  It is undisputed

that Elan could, in theory, have gone to a bank — without breaching the Biogen

Agreement — and attempted to secure a commitment for financing in the event

that Biogen underwent a change of control.  In that case, Elan would possess the

wherewithal to buy out Biogen's rights in Tysabri and any other potential buyers of

---

[116]   *Id.* at 201.

[117]   *See* Martin Tr. 247:5-10.

[118]   *See* Earnings Call at 5.

[119]   *See* 9/3/09 Elan Press Release.

Biogen would still have been faced with the substantial disincentive of losing Biogen's rights in Tysabri. In sum, Bown's allegations of a scheme by Elan and J&J to buy out Biogen by breaching the Biogen Agreement and hiding the details is far less compelling than the opposing inference that defendants merely sought to secure a commitment for financing in case of a change in control at Biogen, and inadvertently breached the Biogen Agreement.

### B. Elan Did Not Have the Opportunity to Commit Fraud

The Second Circuit has defined an opportunity to commit fraud as "entail[ing] the means and likely prospect of achieving concrete benefits by the means alleged."[120] As already described, Bown purports to show "motive and opportunity" by alleging a scheme whereby Elan and J&J agreed to breach the Biogen Agreement, not disclose the details and pressure Biogen into acceding. However, while defendants surely had the opportunity to hide details of an agreement, the prospects for success on this overall scheme would have been very low. If Biogen suspected that Elan was in breach of the Biogen Agreement, Biogen had every incentive to — and in fact did — report this breach. By notifying Elan of such a breach, Biogen stood to acquire all of Elan's valuable rights in Tysabri. While Bown alleges that the purpose of defendants hiding

---

[120]    *Novak*, 216 F.3d at 307 (quotation marks omitted).

information about the breach was to force an acquisition of Biogen or Biogen's rights in Tysabri, Biogen could enforce the Biogen Agreement anytime it saw fit. Given the nature and existence of the Biogen Agreement, it is highly unlikely that defendants could implement any such plan.[121]

### C.   Bown Has Failed to Show Strong Circumstantial Evidence of Fraud

Allegations of "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care" may be sufficient to show scienter in the absence of direct showings of motivation or opportunity.[122]   While a finding of scienter through recklessness is distinct from one based on motive and opportunity, in practice the inquiry is often related and overlapping.[123]   A court must always be mindful, however, that "plaintiffs may not plead fraud by hindsight."[124]   Under this prong, Bown argues that if Elan did not

---

[121]   *Cf. Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (finding no opportunity where "the ordinary course of bank business would lead to" the discovery of the fraud).

[122]   *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011).  By contrast, however, "poor business judgment is not actionable under section 10(b) and Rule 10b-5." *Rothman*, 220 F.3d at 90.

[123]   *See In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 529 n.20 (S.D.N.Y. 2009).

[124]   *Slayton*, 604 F.3d at 776.

knowingly make material misleading omissions, then it acted with a "reckless disregard for the truth."[125]  Specifically, it was reckless of Elan to fail to either (1) discover and disclose the breach of the Biogen Agreement, or (2) disclose the significant risk that Elan had breached the Biogen Agreement.

Bown is certainly correct that it would be reckless for Elan to enter into a new agreement that blatantly breached its most valuable contract and fail to perceive this.  Indeed, "an egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness."[126]  It would, moreover, constitute a material omission for Elan to fail to warn the public about a serious risk where such a risk could have been discovered.  However, Bown has not pleaded the kind of specific facts necessary under the PSLRA to support this conclusion.  As an initial matter, all of the materials cited by Bown indicate that Elan claims to have engaged in extensive "in-depth strategic review" before entering the J&J Agreement.[127]  Such statements, if believed, would tend to refute the inference that defendants acted recklessly.  Thus to properly support a

---

[125]   Pl. Mem. at 16.

[126]   *Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (quotation marks omitted).

[127]   *See, e.g.*, Compl. ¶¶ 22, 23, 25, 26, 28 ("Elan had carefully considered the Biogen Agreement when negotiating the J&J Agreement.").

showing of recklessness, Bown must plead facts that would make the inference that defendants were reckless in failing to realize or disclose the risk of breach — despite their claim to have thoroughly reviewed the deal — at least as compelling as any other inference.

To show such recklessness, Bown primarily relies on the decision of this Court denying Elan's request for a preliminary injunction in the earlier action. While a breach of Elan's most valuable contract is obviously a highly consequential matter to the company, the subsequent finding of a breach does not give rise to a strong inference that defendants were reckless during the Class Period. *First*, without more explicit facts, the subsequent finding of a breach is consistent with Elan's good-faith — though unsuccessful — effort to harmonize both agreements. *Second*, relying solely on this Court's subsequent finding of breach is an impermissible attempt to accuse defendants of fraud by hindsight.

I do note that the materials defendants issued during the Class Period, such as the initial press release and earnings call, do not warn of any possible tension between the Biogen and the J&J Agreements. It is of course true that "[o]nce defendants choose to speak about their company, they undertake a duty to speak truthfully and to make such additional disclosures as . . . necessary to avoid

rendering the statements misleading."[128]  Thus, if Bown can plead facts showing that defendants should have known about the risk that the J&J Agreement would breach the Biogen Agreement during or before the Class Period, such a failure to disclose could support a strong inference of recklessness.

Moreover, while Bown claims that Elan's declaratory judgment suit was a "sham litigation," and a mere "high-stakes gambit" to force Biogen to accede,[129] the chronology of events here shows that Elan was compelled to bring its declaratory action in response to Biogen's letter accusing Elan of breach. Otherwise, Elan stood to lose its most valuable asset.  Thus, conclusory allegations that the suit was brought in bad-faith do not give rise to a strong inference that defendants had been reckless beforehand, and were trying to cover up their intentional or reckless breach of contract.  The more plausible inference would be that Elan was simply responding to Biogen's letter and attempting to establish its rights.

Bown also suggests that this case is "similar to a restatement case."[130] A restatement case usually involves a company reissuing financial statements

---

[128]    *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 226 (S.D.N.Y. 2008) (quotation marks omitted).

[129]    *See* Compl. ¶¶ 9, 34.

[130]    Pl. Mem. at 14.

because of "large corrections," and can constitute evidence of scienter.[131]  While Elan was indeed forced to revise its contract with J&J in the wake of this Court's earlier ruling, that was prompted by the legal conclusion that Elan was in breach, rather than on concealed but verifiable facts.  Thus, without a separate showing that defendants intentionally or recklessly engaged in fraud prior to this Court's legal conclusion, Bown has not pleaded a situation resembling a restatement.  This is especially true when the alleged false and misleading material information is the failure to disclose the breach or risk of breach, rather than the contract itself.

In sum, the primary facts that Bown pleads in support of Elan's intentional or reckless failure to disclose its breach of the Biogen Agreement is Judge Batts's finding — after the Class Period — that Elan was in breach.  Such a legal conclusion and retrospective revelation is insufficient to raise a strong inference of scienter as required by the PSLRA.[132]  Just because a corporation is later found to have breached a contract does not automatically give rise to a strong

---

131    *See, e.g.*, *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 488-89 (S.D.N.Y. 2004).

132    *Contrast with In re Bear Stearns Co., Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 504 (S.D.N.Y. 2011) ("[T]he incantation of fraud-by-hindsight will not defeat an allegation of misrepresentations and omissions that were misleading and false *at the time* they were made.") (emphasis added).

inference that it engaged in fraud beforehand.[133]  Therefore, neither the corporation nor its controlling officers here can be held liable.

## VI.   CONCLUSION

For the reasons discussed above, defendants' motion is granted in its entirety.  Bown is hereby granted leave to file an amended complaint within thirty (30) days.  The Clerk is directed to close this motion [Docket No. 22].


SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        October 18, 2011
              New York, New York

_____

[133]        *See Novak*, 216 F.3d at 309.  This follows from the well-established law in securities litigation that while "the failure to carry out a promise in connection with a securities transaction might constitute breach of contract, it 'does not constitute fraud unless, *when the promise was made*, the defendant secretly intended not to perform or knew that he could not perform.'" *ATSI*, 493 F.3d at 105 (quoting *Gurary v. Winehouse*, 190 F.3d 37, 44 (2d Cir. 1999)) (emphasis added).

**-Appearances-**

**For Lead Plaintiff Thomas H. Bown II:**

Patrick Anthony Klingman, Esq.
James E. Miller, Esq.
Laurie Rubinow, Esq.
Shepherd, Finkelman, Miller & Shah LLP
65 Main Street
Chester, CT 06412
(860) 526-1100

Lesley Elizabeth Weaver, Esq.
Shepherd, Finkelman, Miller & Shah LLP
199 Fremont Street, 20th floor
San Francisco, CA 94105
(415) 992-7282

**For Defendants:**

Charles Alan Gilman, Esq.
David George Januszewski, Esq.
Mary Katherine McCann, Esq.
Cahill Gordon LLP
80 Pine Street
New York, NY 10005
(212) 701-3000